IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COGNATE BIOSERVICES, INC., et al.,

Plaintiffs,

v.

ALAN K. SMITH, et al.,

Defendants.

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS

### I.   INTRODUCTION

Plaintiffs Cognate BioServices, Inc. ("Cognate"), Healthbank, Inc., Oncocidex, Inc., Theradigm, Inc., and Vesta Therapeutics, Inc. (collectively, "Plaintiffs") respectfully bring this motion to compel the American Red Cross (the "Red Cross") to produce documents requested in Plaintiffs' third party subpoena in the underlying action *Cognate BioServices v. Alan K. Smith*, 13-cv-1797 (D. Md.) (the "Underlying Action"), currently pending before Judge Quarles in the District of Maryland.

Plaintiffs regret having to involve the Red Cross (and this Court) in a dispute concerning unlawful computer access and theft of trade secrets by Alan K. Smith, Alan Smith Consulting (together, "Smith" or the "Smith Defendants"), and MacroCure, Ltd. ("MacroCure")[1] (collectively, "Defendants") from Plaintiffs, who are biotech companies focused on cell therapy products and processes. The Red Cross, however, is in possession of critically relevant documents that go to the heart of the claims at issue. In brief: (1) Defendant Smith was CEO of Plaintiff Cognate when he began working with

---

[1]   MacroCure is a named defendant in Plaintiffs' [Proposed] First Amended Complaint ("FAC"), filed as an exhibit to Plaintiffs' Motion for Leave to Amend on May 27, 2014. *See* Hogan Decl., Ex. 2 (FAC); Ex. 8 at Docket No. 36 (Docket for Underlying Action).  The motion remains pending in the District of Maryland.

MacroCure to help arrange for manufacturing and regulatory approval of MacroCure's CureXcell product. (2) Smith, however, resigned from Cognate and instead went into business with MacroCure directly, where he worked on the same clinical trial program for which Cognate had been in negotiations with MacroCure. (3) Even though Smith had resigned from Cognate, he continued to access his Cognate laptop and Cognate's computer network, and misappropriated Plaintiffs' cell therapy trade secrets, including standard operating procedures ("SOPs") that Smith had previously told MacroCure it would need. Finally, (4) Smith and MacroCure went into business with the Red Cross to manufacture CureXcell and the evidence adduced to date indicates that they used the stolen SOPs to expedite the extensive technical preparations required to obtain permission from the United States Food and Drug Administration ("FDA") to move CureXcell directly to "Phase III" trials. Accordingly, the Red Cross has in its possession the very documents that are most relevant to this action, showing clearly the extent to which Smith and MacroCure made use of the SOPs that Smith originally misappropriated from Plaintiffs.

Furthermore, while the Red Cross has expressed willingness to comply with the subpoena that was served on it, its efforts to cooperate have been stymied by the interference of MacroCure, which is holding up the Red Cross's document production on the pretext of a confidentiality agreement between the Red Cross and MacroCure (notwithstanding the presence of a protective order in the Underlying Action). It took MacroCure over two weeks to consent to the Red Cross producing two individual documents, of which MacroCure insisted on heavily redacting one without explanation. This is consistent with MacroCure's (and Smith's) general pattern in the Underlying Action of seeking to

prevent discovery into the merits of Plaintiffs' claims.[2]  Plaintiffs respectfully request that the Court end MacroCure's stalling tactics by ordering the Red Cross to provide the responsive documents that it acknowledges are in its possession.

## II.    BACKGROUND

As detailed in the [Proposed] First Amended Complaint ("FAC") (Hogan Decl., Ex. 2), the Underlying Action stems from the unauthorized access of computer systems by Alan Smith, the former CEO of Plaintiff Cognate, for the purpose of wrongfully obtaining Plaintiffs' trade secrets for unauthorized use in conjunction with the Israeli company MacroCure.  Plaintiffs each operate in the biotechnology industry in the field of cell therapy products.  FAC ¶¶ 11, 15-16.  Cognate performs drug trial manufacturing, develops necessary protocols and SOPs, and otherwise provides consulting services to its clients—including the four other plaintiff entities—to achieve successful passage through the FDA regulatory process.  *Id.* ¶¶ 11-20.  The businesses of the remaining four plaintiff entities involve developing and manufacturing cell therapy treatments and providing other cell therapy-related products and services.  *Id.* ¶¶ 15-16.  Alan Smith was the CEO of Cognate from 2003 until he left Cognate in May 2010.  *Id.* ¶ 21.  After leaving Cognate, Smith improperly retained his Cognate-issued laptop (the "Cognate Laptop"), which contained proprietary confidential information of both Cognate as well as the other plaintiff entities in this action.  *Id.* ¶¶ 28-35.  Smith also retained the information and passwords necessary to access Cognate's virtual private network ("VPN"), which enabled Smith to later access additional proprietary materials of Plaintiffs.  *Id.*

---

[2]   MacroCure has refused to produce any documents in response to a subpoena, and Plaintiffs are currently seeking evidence from MacroCure in Israel pursuant to the Hague Convention.  Likewise, Plaintiffs issued document production requests to Smith in May of 2014, but have not received a meaningful document production as of the date of this motion.

Upon leaving Cognate, Smith immediately began working for MacroCure. *Id.* ¶ 25. MacroCure is an Israeli biotech company engaged in developing a wound-healing product known as "CureXcell." *Id.* ¶ 8.[3] MacroCure is a former Cognate client for which Smith had previously done consulting work in his capacity as an employee of Cognate.[4] Within days of leaving Cognate and joining MacroCure, Smith traveled to Philadelphia, New York and New Jersey to meet with companies vying for the contract to manufacture CureXcell for purposes of FDA Phase III trials.[5] While Cognate had been one of the companies in negotiations with MacroCure to manufacture CureXcell, ultimately, Smith helped MacroCure reach an agreement for the Red Cross to manufacture CureXcell in July 2010.[6] In the course of performing this contract, the Red Cross has acknowledged that Smith was in constant contact with Red Cross employees and worked out of the Red Cross's manufacturing facility in Philadelphia on a daily basis for a period of years.[7]

According to drafts of the MacroCure-Red Cross agreement in Plaintiffs' possession, the agreement required the Red Cross to manufacture CureXcell in accordance with "Procedures" (*i.e.*, the SOPs) that were to be supplied by MacroCure:

---

[3]  *See also* Hogan Decl., Ex. 3 at 7/183 (MacroCure SEC Form F-1).

[4]  *See, e.g.,* Hogan Decl., Ex. 1 at 11-13 (Plaintiffs' Subpoena to the Red Cross) (attaching Smith email to MacroCure, 1/20/10).

[5]  The FDA approval process for a new drug or biologic usually consists of three distinct phases of clinical trials. Following an Investigational New Drug Application ("IND"), a company conducts its Phase I clinical trial, the purpose of which is to demonstrate the safety of the product. After a successful Phase I study, the company would typically submit a second IND to the FDA describing a Phase II trial (or trials) that would include more patients and seek not only to confirm the safety of the product, but to determine the lowest dose at which the product is effective. Following a successful Phase II trial, the company would then submit a third IND and progress to a Phase III trial aiming to determine the effective dose range. Once completed successfully, the company is permitted to submit to the FDA a Biologics License Application (BLA), which, if granted, results in approval of the product for human use. *See* Hogan Decl., Ex. 3 at 79-80/183 (MacroCure SEC Form F-1); 21 C.F.R. § 601.2. Because CureXcell had been used in a hospital in Israel for several years, the FDA permitted MacroCure to begin a Phase III trial without first having to complete Phases I and II. *See* Hogan Decl., Ex. 3 at 72/183 (MacroCure SEC Form F-1).

[6]  *See* Ex. 3 at 76/183 (MacroCure SEC Form F-1).

[7]  Hogan Decl. ¶ 10. While Smith is no longer working for MacroCure, MacroCure nonetheless continues to have a full-time employee working out of the Red Cross's facility in Philadelphia. *See* Hogan Decl., Ex. 5 ¶ 3 (Peer Affidavit).

1.18    a. "Procedure(s)" shall mean (i) all MacroCure's manufacturing and operating procedures and specifications for manufacturing, testing, and release of the Batches. **It is MacroCure's sole responsibility to promptly provide [the Red Cross] with the Procedures in writing and any updates as they occur**. The Parties acknowledge and understand that the final Procedures will be finalized during the Test Period.[8]

In essence, MacroCure was responsible under its contract with the Red Cross for putting the SOPs in place for the Red Cross to use in manufacturing CureXcell.[9]  Smith, as head of MacroCure's U.S. Operations, was the MacroCure employee responsible for everything having to do with manufacturing CureXcell in the United States.  However, emails from Smith to MacroCure in early 2010 demonstrate that only a fraction of the necessary SOPs were actually in place around the time he joined MacroCure.[10]  Shortly after leaving Cognate, Smith began providing the SOPs detailing these procedures to MacroCure using modified Cognate materials that he continued to access from the Cognate network.  FAC ¶¶ 37-38, 41, 45-46, 50, 52.  For instance, on May 31, 2010, Smith emailed MacroCure a version of Cognate's employee training SOP, which was modified to use the MacroCure logo in place of the Cognate logo on every page, except for one page on which Smith inadvertently left the Cognate logo.  *Id.* ¶ 37.  Plaintiffs' ongoing forensic investigation has confirmed that Smith accessed or copied large portions of the SOPs and other proprietary materials belonging to Plaintiffs, and critically, a significant portion of these materials coincide with the same materials that Smith had told MacroCure that it and its manufacturer (the Red Cross) would need for purposes of manufacturing CureXcell pursuant to this contract.  *Id.* ¶¶ 37-39.[11]

---

[8]  Hogan Decl.¶ 21.  (emphasis added).
[9]  *See also* Hogan Decl., Ex. 3 at 23, 76/183 (MacroCure SEC Form F-1) (noting that Red Cross manufactures CureXcell according to technical specifications provided by MacroCure).
[10]  Hogan Decl., Ex. 1 at 11-13 (Plaintiffs' Subpoena to the Red Cross) (attaching Smith email to MacroCure, 1/20/10).
[11]  *See also* Hogan Decl., Ex. 1 at 11-13 (Plaintiffs' Subpoena to the Red Cross) (attaching Smith email to MacroCure, 1/20/10).

Plaintiffs filed the Underlying Action on June 19, 2013, alleging causes of action for theft of trade secrets and unauthorized computer access.[12]   The Court denied Smith's motion to dismiss on March 12, 2014, and the Court entered a scheduling order governing discovery on March 26, 2014.[13] Plaintiffs have diligently sought—and continue to seek—discovery from Smith and MacroCure regarding the misappropriation, but to date, neither of these parties have produced such responsive documents.  Efforts to secure such discovery first began as part of a separate state court proceeding, in which Cognate fought to get Smith to return his Cognate Laptop for months, ultimately receiving that Laptop only days before the close of discovery.  FAC ¶¶ 33, 36.[14]

While Smith previously testified under oath at his deposition that he never accessed any of Plaintiffs' proprietary materials, Cognate's forensic analysis—which could only take place after the close of discovery because of Smith's refusal to produce the laptop earlier—revealed that Smith not only continued to access and use Plaintiffs' trade secrets on the Cognate Laptop, but that he had also transferred materials for use on his MacroCure work laptop (the "MacroCure Laptop"), which laptop's very existence Smith had denied under oath.  *Id.* ¶¶ 37-41.  Cognate sought this second laptop from MacroCure in the state court action, but MacroCure's motion to quash the subpoena was granted on the sole ground that discovery had already closed.[15]  Plaintiffs then served a subpoena on MacroCure in the Underlying Action seeking the laptop, but MacroCure has refused to respond on a (meritless) jurisdictional basis, while the individual MacroCure employee previously in possession of the laptop now claims that he no longer has it, presumably because it was returned to MacroCure's headquarters in

---

[12]   *See* Hogan Decl., Ex. 7 (Original Complaint in the Underlying Action).
[13]   Hogan Decl., Ex. 8 at Docket Nos. 22, 25 (Docket for Underlying Action).
[14]   *See also* Hogan Decl., Ex. 9 (Order Quashing Subpoenas) (noting discovery deadline of 10/29/12).
[15]   Ex. 9 (Order Quashing Subpoenas).

Israel.[16]  Plaintiffs have accordingly been forced to seek discovery from MacroCure in Israel pursuant to the Hague Evidence Convention.[17]  Plaintiffs likewise served document requests on Smith nearly two months ago seeking the relevant SOPs, but have received no such documents and have been forced to serve a now-pending motion to compel.  As a result, to date, Plaintiffs have been unable to obtain the necessary documents from Smith or MacroCure.

Regardless of whether Smith and MacroCure ultimately produce responsive documents, the Red Cross possesses evidence critical for determining the extent to which Plaintiffs' proprietary SOPs and other materials were used in the manufacture of CureXcell.  Plaintiffs initially reached out to the Red Cross to discuss the collection of documents relevant to the Underlying Action on April 22, 2014.[18]  After the Red Cross expressed concern over the confidentiality of the documents at issue, Plaintiffs sought and ultimately obtained on June 20, 2014, a protective order from the Court in the Underlying Action.  This systematic protective order—which is substantially identical to the model provided by the Maryland local rules—provides for any party producing documents to be able to designate those documents confidential, as appropriate, and that materials so designated may not be used or disclosed outside of the litigation.[19]

On June 20, 2014, the same day that the Court issued the Protective Order, Plaintiffs reached out to the Red Cross and served an informal copy of the request for documents that Plaintiffs would seek via subpoena.[20]  After some additional discussions with the Red Cross, Plaintiffs served the subpoena at issue here on June 24, 2014, setting a return date of July 21, 2014, at the Red Cross's request.[21]  The

---

[16]  *See* Hogan Decl., Ex. 10 (Email from Gerson Panitch, 5/19/2014).
[17]  Hogan Decl., Ex. 8 at Docket Nos. 32, 42 (Docket for Underlying Action).
[18]  Hogan Decl. ¶ 3.
[19]  Hogan Decl., Ex. 6, ¶ 1 (Protective Order).
[20]  Hogan Decl., Ex. 14 at 1 (Letter from Howard Hogan, 8/6/14).
[21]  Hogan Decl., Ex. 14 at 1 (Letter from Howard Hogan, 8/6/14).

subpoena requested the same narrowly defined set of documents originally sought in the June 20 letter, including primarily the SOPs that Plaintiffs have reason to believe Smith misappropriated and transferred to the Red Cross.

In a July 21, 2014 letter from counsel, the Red Cross objected to all of Plaintiffs' requests for which it acknowledged having responsive documents, primarily citing MacroCure's contention that the documents sought are covered by the confidentiality provisions of its contract with the Red Cross.[22] Counsel for Plaintiffs spoke with counsel for Red Cross on July 23, July 28, and July 30, 2014, but were unable to reach an agreement, because MacroCure had instructed the Red Cross not to produce documents that it had not approved.[23]  Finally, on August 6, 2014, MacroCure approved and Red Cross produced exactly two documents:  a list of approximately 300 SOPs that Red Cross has in place for CureXcell production, and a heavily redacted copy of the MacroCure-Red Cross contract.[24]  These documents emphatically confirm the relevancy of the SOPs and related documents sought by the subpoena; from the SOP titles alone, Plaintiffs have identified approximately three dozen that correspond to SOPs identified by Smith in early 2010 as ones that MacroCure did not have and would need to obtain in order to manufacture CureXcell in the United States.[25]

To the extent that the Red Cross has objected on grounds of overbreadth and burden, providing the SOPs from the previously produced list cannot be considered burdensome, as it only constitutes approximately 300 documents.  With regards to the related documents beyond the 300 SOPs, Plaintiffs and the Red Cross have both expressed a willingness to negotiate, but cannot meaningfully do so with MacroCure holding up the production on a document-by-document basis, and redacting documents

---

[22]  Hogan Decl., Ex. 4 (Letter from Lori Polacheck, 7/21/2014).
[23]  Hogan Decl. ¶ 9.
[24]  Hogan Decl. ¶ 15; *see also* Hogan Decl., Ex. 11 (Email from Gerson Panitch, 7/29/14).
[25]  Hogan Decl. ¶ 15; Hogan Decl., Ex 14 at 1 (Letter from Howard Hogan, 8/6/14).

without explanation.  Cognate has further offered to retain an e-discovery vendor, at its own expense, to assist with the collection and processing of responsive documents and to reimburse the Red Cross for its reasonable costs incurred in complying with the subpoena in order to minimize any burden on the Red Cross.[26]

### III.    ARGUMENT

#### A.    Legal Standard

Rule 45 of the Federal Rules of Civil Procedure allows parties to a litigation to seek documents and other discovery from third parties pursuant to a subpoena like the one issued here.  The scope of documents permissibly sought through a third-party subpoena is governed by the general rules of discovery under Federal Rule of Civil Procedure 26(b), which provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Relevance, in the context of discovery, is "broadly construed" and encompasses not only admissible evidence, but also information that will "have some probable effect on the organization and presentation of the moving party's case" at trial. *Jewish War Veterans of the United States of Am., Inc. v. Gates*, 506 F. Supp. 2d 30, 41-42 (D.D.C. 2007).

If a party responding to a subpoena objects pursuant to Rule 45(d)(2)(B), a motion to compel is properly brought in the court for the district where compliance is required.  Fed. R. Civ. P. 45(d)(2)(B)(i).  As long as the party seeking discovery can establish the relevance of the information sought, the burden is on the objecting party to explain why discovery should not be permitted. *See Doe v. District of Columbia*, 231 F.R.D. 27, 30 (D.D.C. 2005); *Alexander v. FBI*, 192 F.R.D. 50, 53 (D.D.C. 2000).  Where the court adjudicating the discovery dispute is not overseeing the underlying action and is

---

[26] Hogan Decl. ¶ 12.

less familiar with the facts of the case, it "should err on the side of permissive discovery." *Flanagan v. Wyndham Int'l, Inc.*, 231 F.R.D. 98, 103 (D.D.C. 2005).

Where confidential information is at stake, "[i]t is well settled that there is no absolute privilege for trade secrets and similar confidential information; the protection afforded is that if the information sought is shown to be relevant and necessary, proper safeguards will attend disclosure." 8A Wright & Miller, Fed. Prac. & Proc. § 2043 (3d ed. 1998).[27] Confidentiality agreements between private parties do not justify withholding documents responsive to a properly circumscribed subpoena. *See EEOC v. Severn Trent Servs., Inc.*, 358 F.3d 438, 442-43 (7th Cir. 2004) (Posner, J.) (noting that seeking to use a confidentiality clause in a settlement agreement to block compliance with a subpoena would be an obstruction of justice).

**B.      The Discovery Plaintiffs Seek is Highly Relevant to this Action**

The discovery that Plaintiffs seek from the Red Cross is critically relevant to Plaintiffs' claims in the Underlying Action, and easily meets the broad standard for relevance under the Federal Rules. Fed. R. Civ. P. 26(b). The Red Cross has in its possession the very documents that show the extent to which Smith and MacroCure made use of the trade secrets that Plaintiffs allege were misappropriated. The gravamen of Plaintiffs' Complaint is that Smith improperly accessed Plaintiffs' computer systems and misappropriated Plaintiffs' proprietary materials, including SOPs necessary for cell therapy manufacturing and FDA approval, and used those materials to help MacroCure manufacture and seek FDA approval for CureXcell. The Red Cross is in a unique position to confirm these allegations because, pursuant to the Red Cross-MacroCure contract, it was ultimately the party that used SOPs

---

[27]  *See also Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 362 (1979); *Aluminum Co. of America v. U.S. Dept. of Justice, Antitrust Div.*, 444 F. Supp. 1342, 1347 (D.D.C. 1978) ("[A] court has broad discretion . . . in determining both whether a protective order is warranted and the specific restrictions to be imposed.").

provided by MacroCure and Smith in order to manufacture CureXcell.[28]  Should the SOPs and related

documents in the Red Cross's possession related to CureXcell prove to be substantially identical to or

derivative of Plaintiffs' SOPs, this evidence alone would prove Plaintiffs' claims of misappropriation.

And Plaintiffs are not engaged in a mere fishing expedition here.  To the contrary, they already have in

their possession a copy of an SOP that Smith provided to MacroCure that repurposes an SOP that was

developed by Cognate.  FAC ¶ 37.  Indeed, this exact SOP appears listed by title on the catalog of SOPs

provided by the Red Cross.[29]  Moreover, dozens more of the titles of SOPs on the list provided by the

Red Cross appear to match to those identified by Smith to MacroCure as ones they would need to obtain

in order to manufacture CureXcell.[30]  This easily passes the "broadly construed" definition of relevance

under Rule 26 of the Federal Rules of Civil Procedure.  *Jewish War Veterans*, 506 F. Supp. at 41-42.

**C.    The Red Cross's Confidentiality Objections Are Already Addressed by the Protective Order in the Underlying Action (Response Nos. 1, 6-9, 11-16, 18-19)**

The Red Cross objects to 13 of the requests on the grounds that they seek proprietary information

"covered by a confidentiality agreement with MacroCure,"[31] but such confidentiality concerns merely

control ***how and not whether*** the materials should be disclosed in discovery.  It is "well settled that there

is no absolute privilege for trade secrets and similar confidential information; ***the protection afforded is***

***that if the information sought is shown to be relevant and necessary, proper safeguards will attend***

***disclosure***."  8A Wright & Miller, Fed. Prac. & Proc. § 2043 (3d ed. 1998) (emphasis added).  Courts

have widely recognized that using a confidentiality clause to block compliance with a subpoena would

---

[28]   Hogan Decl. ¶ 21; Hogan Decl., Ex. 3 at 23, 76/183 (MacroCure SEC Form F-1) (noting that Red Cross manufactures CureXcell according to technical specifications provided by MacroCure).

[29]   Hogan Decl. ¶ 15.

[30]   Hogan Decl. ¶ 15; Hogan Decl., Ex. 1 at 11-13 (Plaintiffs' Subpoena to the Red Cross) (attaching Smith email to MacroCure, 1/20/10).

[31]   Hogan Decl., Ex. 4 (Letter from Lori Polacheck, 7/21/2014).

constitute an obstruction of justice, and/or violate public policy.[32] This is why courts routinely address this concern by issuing protective orders—like that which the court has already issued in the Underlying Action—that protect the confidentiality of documents exchanged in discovery.[33] Indeed, any holding to the contrary would have the absurd result of allowing companies that steal trade secrets to withhold documents based on *their own* claims of confidentiality. Here, in fact, the agreement does not even appear to preclude such disclosures. The draft version of the confidentiality clause of the Red Cross-MacroCure agreement in Plaintiffs' possession specifically *allows* disclosures where required by a court order, so long as the disclosing party reasonably resists disclosure.[34] Accordingly, the Red Cross-MacroCure contract does not preclude the Red Cross from disclosing the materials at issue, but at most forces the Red Cross to require a party seeking documents to file a motion to compel—as Plaintiffs have done here.

To the extent that MacroCure (or the Red Cross) has legitimate confidentiality concerns, such concerns are wholly addressed by the protective order already in place in the Underlying Action. The protective order, which is substantially identical to the model protective order included in the Maryland local rules, provides that any party producing discovery materials may designate such materials confidential, and that materials so designated may not be used or disclosed outside of the litigation.[35] MacroCure has not explained to Plaintiffs or the Red Cross why the protective order is insufficient, and

---

[32] *See Severn Trent Servs., Inc.*, 358 F.3d at 442-43 (Posner, J.) (noting that seeking to use a confidentiality clause in a settlement agreement to block compliance with a subpoena would be an obstruction of justice); *EEOC v. Astra USA*, 94 F.3d 738, 745 (1st Cir. 1996) (ruling that agreements to keep evidence from a public tribunal are void as against public policy).

[33] *Merrill*, 443 U.S. at 362 n.24 (noting that trial courts will commonly enter a protective order restricting disclosure rather than forbid disclosure of trade secrets or confidential commercial information); *Genentech, Inc. v. Bowen, CIV. A. 87-605*, 1987 WL 10500, at *2 (D.D.C. Apr. 21, 1987) (ordering disclosure of discovery materials subject to certain restrictions to protect confidentiality); *Wainwright v. Washington Metro. Area Transit Auth.*, 163 F.R.D. 391, 397 (D.D.C. 1995) (granting motion to compel discovery including proprietary trade secrets, subject to protective order limiting disclosure).

[34] *See Hogan Decl. ¶ 21.*

[35] Hogan Decl., Ex. 6, ¶ 1 (Protective Order).

MacroCure has followed the protective order in providing confidentiality designations for the two

documents produced to date.[36]  Should MacroCure seek additional protections accompanying disclosure,

the protective order places the burden on MacroCure to seek such additional protections.[37]

**D.      Other Than the Confidentiality Objections, the Red Cross Makes Only Impermissible Boilerplate Objections on Grounds of Breadth, Burden, and Relevancy (Response Nos. 1, 7-9, 11-16, 18-19)**

The Red Cross objects to 12 of the requests "on the grounds that they are overly broad and

unduly burdensome and not reasonably calculated to lead to the discovery of relevant information or

admissible evidence,"[38] but the Red Cross does not identify with any factual particularity what makes the

requests overbroad or burdensome.  It is axiomatic that objections to discovery requests must be stated

with specificity.  *See, e.g., Athridge v. Aetna Cas. & Sur. Co.*, 184 F.R.D. 181, 190-91 (D.D.C. 1998)

(finding that boilerplate relevancy and burdensomeness objections to requests for production presented

"really no objection at all" and were waived).  The Red Cross's objection does not set forth the basis for

its breadth, burden, and relevancy objections, and each of the requests at issue specifically seeks only

the documents and communications critically relevant to this action.

Plaintiffs seek only two narrowly tailored categories of documents.  First, Plaintiffs have

requested documents and communications from Smith and MacroCure regarding a finite list of items

that ***Smith specifically identified in an email*** to MacroCure as "systems and/or documents which will

likely need to be put in place" for MacroCure to comply with the FDA's Good Laboratory Practices

Standards.[39]  Here, Plaintiffs have a specific documentary basis for believing that any such documents in

---

[36]  Hogan Decl. ¶ 15; Hogan Decl., Ex. 15 (Email from Lori Polacheck, 8/7/14).
[37]  Hogan Decl., Ex. 6, ¶ 3 (Protective Order).
[38]  Hogan Decl., Ex. 4 (Letter from Lori Polacheck, 7/21/2014).
[39]  *See* Hogan Decl., Ex. 1 at 8, 11-13 (Plaintiffs' Subpoena to the Red Cross).  This request in full is: "1.      All documents and communications provided to ARC by Alan Smith or MacroCure concerning any item discussed in Exhibit B, attached hereto.").

the Red Cross's possession may reflect misappropriated information, and Plaintiffs even went so far as

to provide that document along with the subpoena.  Moreover, dozens of the SOPs on the list provided

by the Red Cross appear to match the SOPs identified by Smith in his email to MacroCure.[40]

Second, Plaintiffs seek certain SOPs and related documents in the possession of the Red Cross

that are used in the manufacturing of CureXcell.[41]  Specifically, these include specific categories of

SOPs and related documents required to support regulatory submissions to the FDA for clinical trials

(especially Phase III trials) in support of a new drug application, and only those SOPs and related

documents provided by Smith or MacroCure.[42]  These categories of SOPs and related documents are

precisely the type of materials that MacroCure and the Red Cross would find necessary in seeking to

navigate the FDA regulatory process, and are precisely the type of proprietary materials that Smith

---

[40]  Hogan Decl. ¶ 15; Hogan Decl., Ex. 1 at 11-13 (Plaintiffs' Subpoena to the Red Cross) (attaching Smith email to MacroCure, 1/20/10).

[41]  *See* Hogan Decl., Ex. 1 at 8-9 (Plaintiffs' Subpoena to the Red Cross). These requests are as follows:

7.        All Standard Operating Procedures (SOPs) supporting a Type I or V DMF referenced in a CureXcell IND submission.

8.        All SOPs supporting the CMC portion of a CureXcell IND submission.

9.        Any SOPs created, modified, or provided by MacroCure or Smith to ARC concerning a quality program.

11.        Any SOPs created, modified, or provided by MacroCure or Smith to ARC concerning product evaluation and lot release.

12.        Any SOPs created, modified, or provided by MacroCure or Smith to ARC concerning storage.

13.        Any SOPs created, modified, or provided by MacroCure or Smith to ARC concerning product labeling, issue, and administration.

14.        Any SOPs created, modified, or provided by MacroCure or Smith to ARC concerning product receipt and distribution.

15.        Any SOPs created, modified, or provided by MacroCure or Smith to ARC concerning final product preparation, issue, and administration.

16.        Any SOPs created, modified, or provided by MacroCure or Smith to ARC concerning how to write an SOP.

18.        Approved supplier lists and related SOPs created, modified, or provided by MacroCure or Smith to ARC.

19.        Any supplier audit checklist, supplier action request form, supplier survey, annual supplier review, supplier board control, and any other document referenced in the approved supplier lists or vendor qualification protocols, or related SOPs created, modified, or provided by MacroCure or Smith to ARC.

[42]  More specifically, Plaintiffs seek the agreed controls used in the manufacture of CureXcell, which must be embodied in the Chemistry, Manufacturing, and Controls (CMC) portion of MacroCure's IND application to the FDA, or in the facility's Drug Master File (DMF) that may be referenced to support an IND application.  A DMF is a submission of information that may be used to provide detailed confidential information about facilities, processes, or articles used in manufacturing, processing, packaging, and storing human drugs and biological products.  The process permits the FDA to review a DMF without disclosing the specific contents of the DMF.  *See* Hogan Decl., Ex. 12 at 4-10 (FDA IND Guidance); Hogan Decl., Ex. 13 at 4-5 (FDA DMF Guidelines).

misappropriated from Plaintiffs.  Plaintiffs have not here requested broad categories of documents such as all of the Red Cross's SOPs, or all correspondence with MacroCure, or all correspondence with Smith—even though such requests would likely yield additional relevant and admissible evidence. Rather, here Plaintiffs have sought to minimize the burden on the Red Cross and circumscribed the requests to include *only* the types of proprietary materials that Smith misappropriated from Plaintiffs and related documents.  The list provided by the Red Cross confirming that there are only approximately 300 SOPs at issue confirms that producing these and related documents would not be overly burdensome.[43]

Beyond narrowing the requests to the key SOPs and communications at issue, Plaintiffs have taken other steps to minimize the burden on the Red Cross, in recognition of its third-party status. Plaintiffs have offered to arrange for a third-party vendor at their own expense to conduct the extraction and review of the documents at issue and to reimburse the Red Cross its reasonable expenses, such as staff overtime or photocopying costs.[44]  Plaintiffs also have offered to initially limit the search for responsive documents to the custodians who the Red Cross identified as having worked most closely with Smith.[45]  Finally, Plaintiffs have offered to further negotiate limitations to the review and production once a preliminary production has identified the key time periods of interest.[46]  As a result, the burden of any initial production would be minimal.  Accordingly, these requests are not overly broad and burdensome, and reflect only those documents directly at issue in this litigation.

---

[43] Hogan Decl. ¶ 15.
[44] Hogan Decl., Ex. 14 at 2 (Hogan Letter to Polacheck, 8/6/14).
[45] Hogan Decl. ¶ 11.
[46] Hogan Decl. ¶ 13.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court compel the Red Cross to produce documents responsive to Plaintiffs' requests.

Dated: August 8, 2014

Respectfully submitted,

Howard S. Hogan (D.D.C. Bar No. 492002)
Brian Buroker (D.D.C. Bar No. 457158)
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.530.9550
hhogan@gibsondunn.com
bburoker@gibsondunn.com

*Attorneys for Plaintiffs*